IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| Ramona Pérez Rosario; her husband Julio Antonio García; The conjugal partnership; Juliska Casiano Vargas; her husband Luís Antonio Pérez Márquez; The Conjugal Partnership.<br>Plaintiffs<br><br>Vs.<br><br>America Cruise Ferries, Inc.; Baja Ferries USA; Entities A,B,C; Insurance Companies X, Y, Z.<br>Defendants | Civil No.<br><br><br>Re: Claim for damages under federal question and diversity jurisdiction; maritime liability<br><br>Jury trial demanded |

**COMPLAINT**

TO THE HONORABLE COURT:

NOW COME plaintiffs Ramona Perez Rosario (hereinafter referred to as Perez); her husband Julio Antonio Garcia (hereinafter referred to as Garcia); The Conjugal Partnership formed between Perez and Garcia; Juliska Casiano Vargas (hereinafter referred to as Casiano); her husband Luis Antonio Perez Márquez (hereinafter referred to as Márquez); the Conjugal Partnership formed between Casiano and Márquez, through undersigned counsel, and respectfully state and pray:

I. APPLICABLE LAW

1. This action is brought under Article III, section 2 of the U.S. Constitution; Title 46 USC section 30102; Title 28 USC section 1331; Title 28 USC section 1333. There is also diversity jurisdiction between plaintiffs and defendants, and the amount in controversy exceeds

$75,000.00 exclusive of interests and costs, Title 28 section 1332. Venue is proper in accordance with Title 28 USC section 1391. Jury trial is demanded.

## II.    PARTIES

2. Plaintiffs Ramona Pérez Rosario, her husband Julio Antonio García, and the Conjugal Partnership formed between them, they are of legal age, Dominican Republic nationals, and live at Calle Eduardo Brito número 2, Barrio Enriquillo de Herrera, Santo Domingo Oeste, República Dominicana.

3. Plaintiffs Juliska Casiano Vargas, her husband Luis Antonio Perez Márquez, and the Conjugal Partnership formed between them, they are of legal age and live at Calle Almirante 422, Alturas de Mayagüez, Mayagüez, PR 00682.

4. Defendant America Cruise Ferries, Inc. is a corporation duly registered and authorized by the State Department of Puerto Rico with principal office at Concordia 249, Mayagüez, PR 00680. Their Resident Agent is Néstor González García, his offices are located at Concordia 249, Mayagüez, PR 00680.

5. Defendant Baja Ferries USA is a corporation duly registered and authorized by the state of Miami, Florida, with principal offices at 2601 S Bayshore Dr. #1110, Miami, Fl 33133.

6. Defendants Entities A, B, C, so named because their real name is unknown at present, are persons or corporations who owned,

operated, or maintained the vessel Caribbean Fantasy (hereinafter referred to as The Ferry), that are liable to plaintiffs for the events and damages claimed herein.

7. Defendants Insurance Companies X, Y, Z, so named because their real name is unknown at present, are insurance companies who had issued policies in favor of one or more of the defendants to this action, which cover the events and damages herein claimed.

8. The vessel involved in the incidents that give rise to instant claim is identified as Caribbean Fantasy (herein after The Ferry), which provides ferry services, carrying passengers, luggage, and cargo, between the Dominican Republic and Puerto Rico.

9. At all times relevant to this complaint The Ferry was managed, and/or owned, and/or operated, and/or leased, and/or maintained by America Cruise Ferries, Inc.

10. At all times relevant to this complaint The Ferry was managed, and/or owned, and/or operated, and/or leased, and/or maintained by Baja Ferries USA.

### III. FACTS

11. The Ferry left the port of Santo Domingo, Dominican Republic, on the evening of Tuesday, August 16, for an overnight trip to San Juan, Puerto Rico. The ship was due to arrive in San Juan in the morning hours of Wednesday, August 17.

12. Plaintiffs Ramona Pérez Rosario, Juliska Casiano Vargas, and Luis Antonio Pérez Márquez, were passengers on The Ferry.

13. On or around 7:30 AM on Wednesday, August 17, as The Ferry was approaching its destination, the fire alarm went off.

14. Upon the activation of the fire alarm, the passengers were directed to a common area where they were to be given life vests. The crew assigned to the task could not open the door to the area where the life vests were stored. In desperation, the passengers forced the area open and started distributing the life vests themselves. The scene was one of chaos, hysteria, screaming, pushing and shoving, as passengers were fighting over the life vests and trying to reach safety. All the while they could smell the smoke, which heightened the desperation and fear for their lives.

15. Once the life vests were apportioned, passengers were directed to the life boats to abandon ship. Priority for boarding the life boats was given to children, women, and older persons.

16. After a wait of about an hour, plaintiffs were informed that there were no more life boats available. They were then taken to a lower deck, by means ofan inflatable slide, where they were told to wait for a covered raft that would carry them from the ship.

17. They waited for some 30 minutes for the raft. The situation was becoming very desperate, as time passed, the fire was visible, they could smell it, and they feared for their lives.

18. The raft finally arrived, they proceeded to board it. Aboard the raft, people were getting sick and throwing up. Water and sea sickness pills were passed about. The lines tying the raft to the ship started to break. The raft was flimsy and inadequate for he situation, did not provide a sense of security, people were milling about, which added to the chaos and collective fear. Finally, after about an hour of being on the raft, all the lines broke off and the raft left The Ferry towards port.

### IV.     DAMAGES

19. Plaintiffs Pérez, Casiano, and Márquez, suffered contusions and abrasions, from the confusion and the use of the slide to the lower deck, sea sicknes and vomiting, intense mental pain and anguish, they feared for their lives for a period of several hours, until they finally reached land.

20. Plaintiff Pérez had to undergo psychological treatment because of the experience lived and was diagnosed with Post Traumatic Stress Disorder. Perez has suffered and continues to suffer damages due to the events herein described.

21. Plaintiff García is the husband of plaintiff Perez, he was at home in the Dominican Republic when the incident occurred. A neighbor told him about the fire on The Ferry, he immediately tried to reach his wife concerned about her safety. He called his wife repeatedly but had no answer. He became desperate as he had no news from his wife and assumed the worst outcome. He kept watching the news of the

incident on TV and the images of The Ferry on fire heightened his apprehension. His levels of anxiety rose, his pulse accelerated, and a general sense of unease took over him. He sought psychological help and was diagnosed with acute stress syndrome. Perez suffered and continues to suffer damages due to the events herein described.

**The particular situation of Casiano and Márquez:**

22. Plaintiffs Casiano and Márquez were traveling with their pets. Two dogs named Blackie and Gorku. They were stowed in a separate compartment, along with all the other mascots.

23. When the fire emergency started, plaintiff Casiano enquired about the dogs, and was given different accounts by the crew members they questioned. She was told that the dogs were in a secure place, waiting to be taken ashore. She was also told that the dogs were being taken ashore, and yet a third version that the dogs were already ashore.

24. Once Casiano reached shore, she was given first aid by medical emergency personnel, because she was weak, dizzy, nauseous, and had been vomiting.

25. Once she was released by the paramedics, she proceeded to the area where the rest of the passengers were gathered and saw that there were only 3 kennels, when she had seen 7 dogs on board. She asked the veterinarian Elis Diaz for her dogs and was told that they were at the San Juan animal shelter and would, later, be taken to a pet hospital.

26. Plaintiff Casiano then waited for her husband, as he had not been medically discharged yet, worried over him and the dogs.

27. Her husband finally arrived and she got a call from the Coast Guard saying that they had Blackie, one of the dogs, at Isla Grande. They went to Isla Grande and recovered Blackie. She asked about Goku, the other pet, and was told that they knew nothing of him.

28. Casiano went back to the Panamerican pier to enquire about her missing dog, Goku, and no one there knew where he was. She was told by a crew member that he might be at the animal shelter or at pier 6. She went to pier 6 and there was no one there.  At that time they were able to turn on the GPS installed in the dog's collar and it showed that Goku was at Paseo La Princesa in old San Juan. Once there, the signal pointed to La Puntilla, where the Coast Guard facilities are located. The Ferry was also close to the Coast Guard facilities.

29. Casiano and Márquez went to the Coast Guard office at La Puntilla to ask about their missing dog, Goku, and they were told that they knew nothing about Goku.

30. By this time it was evening already, they had spent most of the day looking for Goku and were unable to find him, and no one gave information as to the whereabouts of the pet. They decided to go home to Lajas.

31. At night, when they arrived home, Casiano posted on the social media the description and picture of Goku and it went viral, yet no one had any information. Goku was a 4 year old English bulldog.

32. The following day, August 18, Casiano was informed by her father that Captain Torres from the Fire Department wanted to speak with her. When she called he told her that all the dogs had been rescued and gave her the name of an Emergency Management employee, who, in turn, told her that all the dogs were at the San Juan animal shelter.

33. Casiano drove to the San Juan animal shelter, spoke with Mariangely Gely, Director of the shelter, who told her that she only had custody of 2 dogs, and one of them had already been claimed. Goku was not there.

34. During that day, August 18, she got news from the newspaper Primera Hora, stating that a spokesperson from the Coast Guard named Castrodad had informed that aerial recognizance of The Ferry showed that several dogs were seen running on deck.

35. Casiano drove to the Coast Guard offices at La Puntilla to enquire about her pet, and was told that they had no news about Goku.

36. Casiano got a call from another passenger, who also had a dog on The Ferry, to notify her about a press conference being held by some of the rescuers of The Ferry. Together they went to the conference, where they were interviewed by the Director of Animal Cruelty, Iris

Quiñones, Mr. Remy, from animal protection, Nuria Sebazco, Telemundo reporter, and Susan Soltero.

37. After a few minutes, Ángel Crespo, from the Emergency Rescue unit, told Casiano that the dogs had been seen running on the deck of The Ferry and they were going to rescue them. After more waiting and additional calls, she was told that the dogs would be rescued in the morning of the following day, August 19. She, then, went back home to Lajas.

38. The following morning, August 19, she drove back to San Juan in the hopes of recovering her pet. She went to the Coast Guard office and, after a long wait and several conversations, she was told that Goku was dead. She wanted to identify her dog, but was shown, instead, a photo of the dog´s ID tag, which she identified as belonging to Goku. She was not allowed to see her dog because, she was told, he was in a very bad state of decomposition.

39. Casiano requested that a necropsy be performed because she wanted to know the cause and time of death, yet she was told that no necropsy would be performed.

40. Casiano and Márquez, in addition to the pain and suffering they personally experienced, also suffered the anguish of 3 days running around trying to locate their pet Goku and, after having their hopes raised by the good news that the dogs were sighted running on the deck of The Ferry, and given assurances that they would be rescued,

their hopes were dashed by the devastating news of his death. They were deprived of the companionship of Goku, a pet which they cherished, interacted with, and accompanied them on their travels.

41. Plaintiffs Casiano and Márquez suffered and continue to suffer damages as a result of the events herein described.

42. As a result of the events herein described, plaintiffs suffered and continue to suffer physical pain, psychological damages, panic, sadness, anxiety, episodes of vomiting, sense of despair and helplessness, dehydration, apathy, episodes of insomnia, nightmares, depression, which have greatly affected their daily lives. The damages suffered by all of the plaintiffs apply to all causes of action.

## V.   CAUSATION

43. The events and damages herein claimed were due to the sole responsibility of defendants because of their lack of reasonable care in the operation and/or maintenance of the vessel and its components.

## VI.   RELIEF

44. Plaintiffs pray this court enter judgment in their favor, awarding monetary compensation in the following amounts:

Plaintiff Pérez

   a. plaintiff Perez for physical and emotional damages, pain, anguish, and suffering, an amount in excess of $700,000.00.

   b. punitive damages for an amount not less than $300,000.00.

    c. economic damages for the loss of her belongins, an amount not less than $5,000.00.

    Plaintiff García

    d. plaintiff García for physical and emotional damages, pain, anguish, and suffering, an amount in excess of $500,000.00.

    e. punitive damages for an amount not less than $300,000.00.

    Plaintiff Casiano

    f. plaintiff Casiano for physical and emotional damages, pain, anguish, suffering, the loss of her dog Goku, an amount in excess of $1000,000.00.

    g. punitive damages for an amount not less than $500,000.00

    h. economic damages for the loss of her belongings, an amount of not less than $10,000.00.

    Plaintiff Márquez

    i. Plaintiff Márquez for physical and emotional damages, pain, anguish, suffering, the loss of his pet Goku, an amount in excess of $1000,000.00.

    j. Punitive damages for an amount not less than $500,000.00.

    k. Economic damages for the loss of his belongings, an amount of not less than $5,000.00.

    l. Provide for payment of interests, costs, attorney´s fees, and expenses.

    m. Grant such other and further relief as the court deems appropriate

RESPECTFULLY SUBMITTED

In San Juan, Puerto Rico, this 2nd. day of December, 2016.

                                        Pérez Rivera Law Offices
                                        P.O. Box 9007
                                        San Juan, PR  00908
                                        Tel  787.348.1931
                                        Fax 787.782.0960

                                        *S/Héctor J. Pérez- Rivera*
                                        HECTOR J. PEREZ -RIVERA
                                        USDC  No.: 212213
                                        e-mail: hectorjuanp@hotmail.com